Exhibit D

5/3
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

### 09-772NY

BRADLEY REIFLER

        Claimant

    v.

PALI CAPITAL, INC.

        Respondent

_____

PALI CAPITAL, INC.

        Respondent
    v.

BRADLEY REIFLER

        Counter Respondent

    AND                             **Answer, Counterclaim and
Third Party Claim**

DAVID WASITOWSKI

        Third Party Respondent

_____

## ANSWER, COUNTERCLAIM AND THIRD PARTY CLAIM OF PALI CAPITAL, INC.[1]

---

[1] Sometimes referred to as "this pleading."

1

## Table of Contents

**INTRODUCTION**

**STATEMENT OF COUNTERCLAIMS AGAINST CLAIMANT BRADLEY REIFLER AND THIRD PARTY CLAIMS AGAINST DAVID WASITOWSKI**

I.      **Background**

II.     **FINRA Jurisdiction Over This Counterclaim and Third-Party Claim**

III.    **Events Leading to This Dispute**

IV.    **The Misconduct at Issue**

      A.     **Unauthorized Compensation: Reifler Deliberately Miscalculated Amounts Due Under His Employment Agreement and Thereby Took from Pali at Least $5,783,361 to Which He Was Not Entitled.**

      B.     **Other Violations of By Reifler of His Employment Agreement.**

      C.     **Self Dealing: Reifler Caused Pali to Pay Him Millions of Dollars of Additional Compensation *Unrelated* to His Employment Agreement Without the Knowledge or Consent of the Board of Directors.**

      D.     **Reifler's Illegal Entrenchment Efforts Breached His Fiduciary Duties and Cost Pali $12 Million or More.**

          (i)     **Reifler's Attempt to *Dilute* the Majority.**

          (ii)    **Reifler's Attempt to *Disenfranchise* the Majority.**

          (iii)   **The Forgery.**

      E.     **Theft of Corporate Opportunity by Reifler.**

          (i)     **Reifler's Theft of Valuable Burnham Hill Warrants.**

          (ii)    **Reifler's Theft of Fees and Valuable Acquisition Rights from Logos Capital.**

      F.     **Reifler's Abuse of Corporate Control.**

**CAUSES OF ACTION**

I.    **Breach of Fiduciary Duty - Reifler**

II.   **Inducing Breach of Fiduciary Duty - Reifler**

III.  **Breach of Fiduciary Duty - Wasitowski**

IV.   **Fraud - Reifler**

V.    **Accounting - Reifler**

VI.   **Breach of Contract - Reifler**

VII.  **Conversion - Reifler**

VIII. **Gross Mismanagement - Reifler**

IX.   **Waste of Corporate Assets - Reifler**

X.    **Abuse of Control - Reifler and Wasitowski**

XI.   **Unjust Enrichment - Reifler**

**STATEMENT OF ANSWER**

**PALI'S AFFIRMATIVE DEFENSES TO REIFLER'S CLAIMS**

## <u>INTRODUCTION & SUMMARY OF PALI'S POSITION</u>

Pali Capital, Inc. (together with its holding company, Pali Holdings, Inc., "Pali" or "the Company"), by its attorneys, Jenner & Block, LLP hereby:

- Counterclaims against Bradley Reifler;

- Asserts Third Party Claims against David Wasitowski; and

- Answers Reifler's Statement of Claim;

This FINRA arbitration[2] is the final and determinative chapter in a dispute that has raged for more than a year between Pali's majority shareholders on the one hand, and Bradley C. Reifler, the now disgraced former Chairman and CEO of Pali, on the other. The roots of this dispute, which has resulted in Pali's claim against Reifler in this proceeding of $40 million dollars or more, go back several years -- covering a period of time during which Reifler secretly ran Pali as his own private fiefdom, and engaged in corporate looting that only ended on October 31, 2008, when Reifler was forced to resign in shame after it was discovered, and he confessed, that he had *forged* a proxy in an illegal attempt to defeat the will of the majority shareholders of Pali who were seeking to remove him from the Company.

## <u>STATEMENT OF COUNTERCLAIMS AGAINST CLAIMANT BRADLEY REIFLER AND THIRD PARTY CLAIMS AGAINST DAVID WASITOWSKI</u>

### I.      BACKGROUND FOR PALI'S COUNTERCLAIMS AND THIRD-PARTY CLAIMS.

1.      **The Basis For Pali's Claim Against Reifler.**  Pali seeks to recover $40

---

[2]  On February 12, 2009, Bradley Reifler filed his Statement of Claim against Pali.  On March 26, 2009, Pali requested a 30-day extension of time in which to answer Reifler's Statement of Claim.  The reason for Pali's request for an extension was Pali's need for more time to investigate the complex facts that form the basis of Pali's counterclaims, third-party claims, and defenses.  By agreement, approved in writing by the FINRA Case Administrator on April 6, 2009, the time for Respondent Pali to respond and assert counterclaims and third party claims was extended to May 8, 2009 and the venue was determined to be New York City.

million dollars or more from Reifler based on

- His long undisclosed but continuous and pervasive breaches of his fiduciary duties and duty of loyalty,

- resulting in a requirement that he forfeit all compensation Pali paid to him, as required by the "Faithless Servant Doctrine," a well-established rule of New York law, and

- other damages caused by Reifler's specific acts of fraud, theft, waste of corporate assets, abuse of control, breach of employment contract, unjust enrichment and conversion.

2. **The Basis For Pali's Claim Against Wasitowski.** Pali seeks to recover damages from Wasitowski, the former Chief Financial Officer and Chief Operating Officer of Pali, based on his breach of fiduciary duties and duties of loyalty, his complicity in Reifler's wrongful acts, and his aiding and abetting of Reifler.

3. **Fiduciary Duties.** It is axiomatic that Reifler, as Chief Executive Officer and Chairman of the Board of Directors, and Wasitowski, as Chief Operating Officer, Chief Financial Officer and a Director of Pali, owed fiduciary duties of good faith, fidelity, loyalty and care to Pali and its shareholders. These duties required them to:

(a)    manage Pali in a manner that benefited Pali and its shareholders and not their personal interests;

(b)    act in furtherance of the best interests of Pali;

(c)    govern Pali in a manner that benefits the company, and its shareholders, not their personal interests;

(d)    not favor their own interests at the expense of Pali;

(e)    truthfully, promptly, and accurately report on the status of Pali and its operations and finances to the shareholders; and

(f)    avoid and prevent corporate waste and unnecessary expense.

4. **Reifler's Employment Agreement.** In addition to the fiduciary

obligations imposed on him as a Director and Officer,  Reifler accepted additional

fiduciary responsibilities and limitations, as set forth in an October 2, 2001 Employment

Agreement signed by Reifler individually and Reifler on behalf of Pali Capital, Inc.,

(together with an extension dated March 2006 the "Employment Agreement").

     5.    **The "Faithless Servant Doctrine" Requires Forfeiture of**

**Compensation.**  Reifler's pervasive breaches of his duties of loyalty and good faith warrant

forfeiture of all compensation paid to him pursuant to the Faithless Servant Doctrine -- a

well-established rule of New York law that requires him to disgorge and forfeit the

$15,697,481 compensation paid to him beginning with his first act of disloyalty.[3]

Wasitowski's compensation must be forfeited, too, based on his breaches of fiduciary duty.

     6.    **Damage to Pali Caused by Reifler's Specific Acts**.  Reifler's disloyalty

was *not*  limited to a single isolated incident, but rather occurred repeatedly.  For example:

    A.    **Unauthorized Compensation.**  Reifler took at least $5,783,361 million dollars
of compensation to which he was not entitled under his Employment
Agreement.  Aided and abetted by Wasitowski, he deliberately miscalculated
amounts due under his Employment Agreement and concealed this theft through
fraudulent accounting  and audit practices.

    B.    **Self Dealing.**  Reifler engaged in self dealing by causing Pali to pay him at
least $4 million dollars unrelated to his Employment Agreement without the
consent or knowledge of the Board of Directors or members of its Compensation
Committee;

---

[3] *See, e.g., Phansalker v. Weinroth,* 344 F.3d 184, 202 (2d Cir. 2003) ("[M]isconduct by an
employee that rises to the level of a duty of loyalty or good faith is sufficient to warrant
forfeiture"); *See also, e.g., Commercial Litigation in New York State Courts,* (2008) and the
many cases cited therein. ("The faithless servant doctrine provides that an employer is entitled to
the return of compensation paid to the employee during the period of disloyalty.") (internal
citations omitted). At such time as the Arbitrators may request, Pali will submit a complete
Memorandum of Law, demonstrating the strict adherence to these rules demanded by applicable
New York law.

**C.**   **Misuse of Corporate Assets.**  Reifler caused Pali to spend more than $12 million in an ultimately unsuccessful attempt to illegally entrench himself as an officer and director of Pali contrary to the statutory and by-law based rights and will of the Majority Shareholders to remove him;

**D.**   **Theft of Corporate Opportunity.**  Reifler took for himself corporate opportunities valued at more than $1.6 million that belonged to Pali;

**E.**   **Perjured Testimony.**  Reifler perjured himself by testifying under oath that a purported proxy was in fact signed by a shareholder, even though he had forged the shareholder's signature on the document.  Reifler's fraud and perjury regarding the purported proxy resulted in Pali expending millions of dollars pursuing Reifler's baseless legal attacks on Pali shareholders;

**F.**   **Criminal Investigation.**  Reifler is currently the subject of a criminal investigation by the New York District Attorney concerning the document he forged and his false representation to the Supreme Court of New York that it was genuine.  Cooperating in this criminal investigation and conducting its own internal investigation into Reifler's misconduct has cost Pali substantial time, money, man hours, and resources, and the public, criminal investigation risks damaging Pali's goodwill and reputation;

**G.**   **Other Significant Misconduct.** Reifler paid fictional expenses to relatives, refused to allow corporate processes to function, denied shareholder rights, and made numerous untrue statements to directors, shareholders, and others; and

**H.**   **Damage to Pali's Enterprise Value.**  Reifler's conduct, included his forgery, perjured testimony and the ensuing Criminal Investigation have materially reduced Pali's enterprise value in an amount to be determined by expert testimony.

7.   **Additional evidence of the manner in which Reifler's disloyalty permeated his conduct as a director and Chief Executive Officer is found in emails in which he confesses to his wrongful actions.**  For example, Reifler

(a)   Confessed that he had forged the signature in question;

(b)   Admitted to Directors that he had improperly taken compensation;

(c)   Demonstrated his total disregard of fundamental rules of corporate governance by attempting to excuse his conduct by arguing that whatever he did wrong, his contributions "exceed by many millions of dollars the amounts over which my accusers are disrupting the functioning of Pali;"

(d)    Admitted his wrongdoing in connection with his taking for himself valuable options that belong to Pali;

(e)    Denied Independent Directors their well established right to corporate books and records; and

(f)    Engaged in bizarre behavior and made violent threats to an Independent Director who was questioning his conduct.

8.    **Breaches of Fiduciary Duty Are Not Excused By Claims of "Good Faith."**

In his Statement of Claim in this FINRA arbitration, Reifler attempts to excuse his illegal conduct on the grounds that he did everything "for the good of Pali."    But Reifler's self indulgent claims of personal sacrifice and vision (*Statement of Claim, paragraph 6)* are legally not relevant, because it is well settled New York law that proof of wrongful intent is not necessary to establish a breach of fiduciary duty claim -- and as a corollary, that good faith is not a defense to a claim for disgorgement of compensation by one who has breached his fiduciary duty.[4]    But relevance aside, Reifler's claims of personal sacrifice and vision are simply wrong as a matter of fact:  As will be shown below, while Reifler has done very well for Reifler, he has not done well for Pali. Indeed, as a direct result of Reifler's illegal conduct, the value of Pali is materially less than it would have been absent Reifler's illegal conduct.

9.    **Wasitowski Aided and Abetted Reifler's Misconduct.**  Reifler's misconduct could not have been accomplished without deception, and without the complicity of others.  Reifler co-opted Pali's Chief Financial Officer (and later Chief Operating Officer) Third Party Respondent David Wasitowski to assist his nefarious schemes. As Chief Financial Officer, Wasitowski was responsible for overseeing Pali's funds and dealing with Pali's accounting and outside auditors.  As Chief Operating Officer, Wasitowski was responsible for managing the

---

[4] *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y. 2d 928,929 (1977) ("It does not make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity of the agent.")

various Pali business units, including back office operations and for Pali's strategic planning. Wasitowski, through his control of Pali's accounting functions and operations, controlled the flow of information to the Directors and affirmatively and deliberately kept critical information concerning Reifler's misconduct from the Independent Directors, and in addition was complicit in Reifler's ill-fated attempt to win a proxy contest by forging a proxy.

10.   **Other Wrongdoing.**   There is substantial, credible and compelling evidence of all the wrongdoing identified in this pleading.   But Pali does not know everything, in large part because Reifler and Wasitowski directly and by deceit concealed their activities and denied access to important proof needed to determine the full extent of their wrongdoing and the damage they have inflicted on Pali.   Reifler's and Wasitowski's stonewalling was legally indefensible. By itself, their blockade constituted compelling evidence of their self-dealing, breach of fiduciary duty, other improper actions and damage to Pali.   Pali believes that the wrongful conduct identified in the following paragraphs and elsewhere herein represents only the tip of the malfeasance iceberg. Pali continues its efforts to uncover relevant information, and will seek to amend this pleading  at an appropriate time so as to reflect the full scope and nature of Reifler's and Wasitowski's wrongdoing.

## II.      FINRA JURISDICTION OVER THIS COUNTERCLAIM AND THIRD-PARTY CLAIM

11.   **Pali Capital, Inc.**   Pali Capital, Inc. is a corporation organized and existing under the laws of the State of Delaware and authorized to conduct business in New York.   Pali Capital, Inc. is an SEC-registered broker-dealer under the Securities and Exchange Act of 1934, as amended, and a FINRA member in good standing  and is therefore a "member" who is properly compelled to assert its counterclaims and third party claims against Reifler and Wasitowski in this FINRA arbitration.   Pali Capital, Inc. provides securities brokerage services

to hedge funds, large institutions, and individuals. It also derives considerable revenue from investment banking, management buy-outs and leveraged buy-outs, corporate finance fees, referral fees, currency gain and loss, and interest and dividends. It assists in market making, recapitalizations, mergers and acquisitions, and mezzanine and bridge financings. It also invests in hedge funds and other entities, and provides online trading services for its clients.

12.   **Pali Holdings, Inc.,** is the parent holding company of Pali Capital, Inc.  It conducts all of its operations through its subsidiaries, including, principally, Pali Capital, Inc.

13.   **Counter Respondent Bradley Reifler** is a citizen of the United States and resides in Millbrook, New York. Reifler was, until discovery of his forgery on October 31, 2008, Chairman, Chief Executive Officer and a director of Pali.  During his tenure with Pali, Reifler represented the Company in his capacity as a FINRA-registered individual.  Reifler also approved and signed FOCUS, compliance, and other reports for the Company.  Prior to 2000, Reifler was the head of the institutional trading desk at Refco, the now publicly tarred and bankrupt financial services company.

14.   **Third Party Respondent David Wasitowski** is a citizen of the United States and resides in New Jersey and, to Pali's knowledge, London. He has been Chief Financial Officer and Chief Operating Officer of Pali and a Director of those companies.  During his tenure with Pali, Wasitowski represented the Company in his capacity as a FINRA-registered individual.

15.   Reifler and Wasitowski are "associated persons" as defined by FINRA Rules 13100(r) and 13200(a), and the claims against them arise out of their business activities with Pali.

## III.  EVENTS LEADING TO THIS DISPUTE

16.   In 1999, sixteen individual investors, who today own a majority of the outstanding shares of Pali Holdings, Inc. acquired shares in EuropeanAmerican Investments, NV ("Euram"), a niche investment banking group specializing in brokerage, asset management, and structured products.   These investors are referred to in this pleading as "Majority Shareholders."  Reifler was also an initial shareholder of Euram, though not a member of the Majority Shareholder group. Through a series of corporate transactions, the persons who invested in Euram in 1999 and thereafter became, and continue to be, shareholders in Pali Holdings, Inc. in the same number and proportion as their shares in Euram.

17.   It is correct, as alleged in Paragraph 6 of Reifler's Statement of Claim, that Pali generated close to $1 billion in revenue between 2000 and 2008.  But it is also correct that during this period the net profits of Pali were minimal, *no dividends or distributions of any nature were made by Pali Capital, Inc. to its parent, Pali Holdings, Inc., and no distributions were made by Pali Holdings, Inc to its shareholders.*

18.   For a long period, Reifler consistently turned away requests for financial information and explanation of the fact that despite strong revenue growth nothing was coming to the bottom line.  As a result, the relationship between Reifler and the Majority Shareholders deteriorated and came to a head in January, 2008.  At that time there were nine Directors.  Three were Independent Directors, while six (including Reifler) were aligned with Reifler.  Four of these Reifler directors were controlled by Reifler because they were Pali employees whose status, compensation, benefits and participation in multi-million dollar bonus pools were set by Reifler so that they were entirely dependent on Reifler for their jobs and their compensation.  A fifth Reifler director was controlled by Reifler because he was an attorney, who, while charging

substantial legal fees to Pali, also represented Reifler personally.

19.   And so, in January, 2008, the two Independent Directors, in an effort to discharge their fiduciary duties, retained counsel and sought explanation from Reifler concerning his compensation, and other suspicious conduct that appeared to be the reason for lack of profit and lack of return to the shareholders, whose investments ten years earlier had never produced a return.  Reifler refused to provide explanations, but instead began a campaign of cover-up and intimidation -- a campaign that continues to this very day and that includes extortionate and physical threats to a former Independent Director. Among other things, as set forth below, Reifler denied the Independent Director access to books and records of the company. He prevented Board discussion of issues relating to his conduct by summarily declaring such discussion to be out of order. He misrepresented facts and wrote deceptive and misleading communications to Directors. And he went so far as to refuse to permit Pali's outside auditors to discuss their work with an Independent Director who was a member of the audit committee of Pali.

20.   On March 3, 2008 an Independent Director sent an email to Reifler responding to his vicious attacks and seeking information concerning Reifler's compensation.  Over the next eight hours, Reifler sent six e-mails to that Independent  Director.   Portions of Reifler's emails are produced below. They provide evidence of Reifler's imbalance, lack of fitness, inability to serve and bias:

- "you are insane ... you are poison . .. just leave the company and stay the bitter old man that plays a martyr"

- "one more thing .. fuck you ... you are a miserable lying cheating money laundering bribe giving thief who should be in jail"

- "you should just kill yourself ... do everyone a favor"

- "your kids think you are nuts ... you are a bitter lonely ass ... you need to hurt others

to feel better ... you are dead to me"

- "you will pay . . . oh yes ... you will pay for your sins"

- I never want to be like you in any way ... you are a pathetic person who needs serious help ... you miserable asshole."

21.     The threatening and offensive emails are only a small part of the Reifler intimidation campaign. Reifler engaged in repeated and direct threats and extortionate activity intended to force the Independent Director to stop pursuing information about Reifler's illegal conduct at Pali. Reifler threatened the Independent Director, members of his family and the Independent Director's lawyer that he would "call the US Attorney," and "make sure [the Independent Director] spent the rest of his life in jail" -while at the same time making clear that if the Independent Director would resign immediately from the Board of Directors of Pali  he, Reifler, would withdraw his threats, and would not report his alleged misconduct. The Independent Director, consistent with his fiduciary duties, and satisfied that he had done no wrong, refused to withdraw his requests for information.

22.   As a result of Reifler's conduct, a second Independent Director, who had been recruited to the Board because of his many years experience as a director of public and private companies, communicated the reasons for his resignation to the remaining Directors in a letter sent on April 11, 2008. The letter is a reflection of the central issues underlying this dispute. The resignation letter said:

> Reifler has not permitted the board process to work, and he has actively prevented the board from exercising its moral obligation and fiduciary duty to protect all shareholders against unilateral actions and self dealing. He has done this with arrogant and retributive treatment of those board members who ask questions that he chooses not to answer and those board members who oppose his will. . .Reifler has withheld information that board members are entitled to. An overwhelming majority of the board today consists of employee board members who report to him and whose compensation he

controls. Of course the impropriety of that pales in contrast to [Reifler] setting his own compensation -- self dealing.

The letter of resignation continues:

> In addition, I am deeply troubled by [Reifler's] failure to respond to the several specific allegations made by [the Independent Director]and detailed in the letters that his counsel provided to the board.... And, these important legal issues aside, *he has the lines of authority upside down: He views the board as reporting to him and subservient to the CEO - but that is not how corporate governance works.* (emphasis added)

23.   Reifler was unbending in his refusal to provide explanations for his conduct, and, as is demonstrated below, caused Pali to expend significant sums for legal and consulting fees in an effort to continue to conceal his conduct.  As a result, in June, 2008, certain shareholders of Pali filed a derivative action against Reifler and Wasitowski in the New York Supreme Court, alleging breach of fiduciary duties, accounting, fraud, waste of corporate assets, abuse of control, breach of employment contract, unjust enrichment, conversion, constructive trust, accounting and damages.

24.   In July, 2008, the Majority Shareholders, who held 54.6% of all outstanding shares of Pali,  filed an Article 78 mandamus suit in the Supreme Court of New York, seeking an order requiring Pali to convene a Shareholders' Meeting for the purpose of removing the then acting Board of Directors and Management.  Reifler caused Pali to strongly oppose that action, and caused the expenditure of more than $12 million of Pali's money interposing various fraudulent defenses, based on allegations of facts that did not exist and culminating in Reifler's confessed forgery of a proxy that, had it been valid, would have avoided his removal by the Majority Shareholders.

25.   Following Reifler's confession of his forgery and forced resignation, there was a shareholders' meeting on January 7, 2009, at which, the Majority Shareholders elected

Directors of their choice to replace Reifler and his cronies. It was only then that the Majority

Shareholders could begin their investigation of Reifler's and Wasitowski's wrongdoing. It was

only then that Pali, which until then was used by Reifler as the instrument that permitted him to

steal $40 million dollars, was able to begin its efforts to recover from Reifler the enormous

damage he had done.

## IV.  THE MISCONDUCT AT ISSUE

26.   Under the New York Faithless Servant Doctrine, Reifler's and

Wasitowski's pervasive breaches of fiduciary duty and duty of loyalty require the forfeiture

and disgorgement of all of their compensation during the period of disloyalty.   But in

addition to the remedy of disgorgement of all compensation, each such disloyal act caused

its own significant damage to Pali.   The paragraphs of this pleading that follow, detail these

specific acts of wrongdoing and the damages they caused and demonstrate the pervasive

nature of Reifler's  and Wasitowski's breaches of fiduciary duty.  Taken together, those

breaches form the basis for the invocation of the Faithless Servant Doctrine and require the

disgorgement by Reifler  and Wasitowski of all compensation received by them during the

period of their disloyalty as well as the forfeiture of Reifler's  and Wasitowski's claims to

any compensation allegedly owed during that period.

**A.     UNAUTHORIZED COMPENSATION: REIFLER DELIBERATELY
        MISCALCULATED AMOUNTS DUE UNDER HIS EMPLOYMENT
        AGREEMENT AND THEREBY TOOK FROM PALI AT LEAST $5,783,361
        TO WHICH HE WAS NOT ENTITLED.**

27.   Reifler's Employment Agreement provides that Reifler was entitled to 3% of

"Brokerage Gross Revenues" received by Pali Capital, Inc., and expressly excludes all revenues,

even if they are "Brokerage Gross Revenues" received by any other subsidiary of Pali Holdings,

Inc.  Specifically, Paragraph 3.1 of the Employment Agreement defines "Brokerage Gross Revenue" as "all Revenue received by [Pali Capital, Inc.] from brokerage commissions and mark-ups and mark-downs on [Pali Capital, Inc.'s] principal accounts for transactions ordered after the Closing, but shall not include any brokerage commissions or mark-ups or mark-downs on any principal accounts from business originated by Euram-Holding or its subsidiaries (other than [Pali Capital, Inc.])."  But, as shown below, Reifler, aided and abetted by Wasitowski who was then the Chief Financial Officer, instructed Pali's accountants to calculate his compensation based on  these excluded categories, resulting in overpayment to Reifler of at least $5,783,361. This overpayment is established by a report prepared by FTI Consulting, Inc. ("FTI"), an independent consulting firm that was retained in July, 2008.

28.   The deliberate and fraudulent nature of Reifler's improper calculation of compensation due to him began to unravel when on January 28, 2008, an Independent Director, through counsel, made a written request to Pali for, among other things, "a summary of all compensation received by or promised to Mr. Reifler between 2001 and today."   Two months later, on March 7, 2008, a document entitled "BCR Summary - Compensation and other payments for the Period January 2001 through December 2007" ("Reifler Compensation Report") was delivered to the Directors.   Reifler represented to the Directors that he had reviewed the report with Pali's accountants and that he believed it to be an accurate and complete summary of the compensation that Reifler received and was entitled to since 2001.

29.   But the Reifler Compensation Report was false, fraudulent and misleading. It materially and deliberately misstated the terms of Reifler's Employment Agreement. That report, prepared at Reifler's direction by Wasitowski (in his capacity as Chief Financial Officer) stated that the amount "calculated" as having been earned by Reifler pursuant to his "3%

override" under his "Employment Agreement (3%)," is $17,538,020. The report then states, incorrectly, fictitiously and fraudulently that:

> "Employment Agreement began 10/01/01 and was based on 3% of gross revenue, excluding tax shelter fees."

Using this incorrect statement of what the Employment Agreement "was based on," the $17,538,020 is roughly equivalent to 3% of *all* of the gross revenues realized by Pali Holdings, Inc. for all services and from all subsidiaries.

30.    But if Reifler's compensation had been calculated in accordance with the plain terms of his Employment Agreement, rather than in accordance with a fictitious and fraudulent formula created by Reifler, he would have been entitled to millions of dollars less. That is because Reifler's Employment Agreement does not provide for him to receive 3% of "gross revenues," as stated in the fictitious formula. On the contrary, it provides that "Brokerage Gross Revenues" (on which the 3% compensation is calculated) *excludes* both:

(a)    Revenues received by Pali Capital, Inc. for services provided other than brokerage revenue; such other sources that are excluded by contract include Corporate Finance Fees, Referral Fees, Other Income, Trading Income, Currency Gains and Losses and Interest and Dividends; and

(b)    Revenues, including Brokerage Revenues, received by subsidiaries of Pali Holdings, Inc. other than Pali Capital, Inc.

31.    Because Pali Capital, Inc. receives substantial revenues from services provided other than Brokerage, and Pali Holdings, Inc. derives substantial revenues from subsidiaries other than Pali Capital, Inc. (principally, from its Pali International, Inc. subsidiaries in London and Singapore), the deliberate and fraudulent failure to exclude both of these revenue sources from the calculation of compensation due to Reifler has resulted in overstating, by more than $5 million dollars, the compensation to which Reifler is entitled and was paid under his Employment Agreement.

32.     For example, according to Pali's Fourth Quarter 2007 Report to Shareholders, $48 million of revenues came from corporate finance fees, referral fees, other income, currency G/L and interests and dividends -- all categories that are excluded from the base on which Reifler's compensation was to be calculated. Further, for that year, $67 million was received by Pali International, Ltd. and other subsidiaries whose revenues are excluded from the base on which Reifler's compensation was to be calculated. Thus, Reifler was overpaid for 2007 alone, by approximately $3.5 million, which is 3% of the excluded categories.

33.     Similarly, Reifler's compensation under his Employment Agreement was overstated for the years 2001 through 2006 in proportionately material amounts. Because the Independent Directors were denied access to books and records for many of these years, it was not possible, prior to the discovery of Reifler's forgery and his forced resignation, to allege the exact amount of overpayment.  Pali's investigation and analysis of this issue continue.

34.     Further, Reifler, aided and abetted by Wasitowski,  changed the financial reporting format of Pali Holdings, Inc. in order to cover up the excess compensation he took.  In its financial reports to its Directors and shareholders for the years 2001-2004, Pali Holdings, Inc. had separate line entries for each category of gross revenues: Brokerage, Trading Profit, Corporate Finance Fees, Referral Fees, Other Income, Currency Gains and Losses and Interest and Dividends. Notwithstanding that Reifler's 3% compensation was to be calculated based on "Brokerage," the Reifler Compensation Report shows that he was paid 3% of the entire Gross Revenues for those years.

35.     Beginning in 2005 or 2006, however, Pali Holdings, Inc. changed its financial reporting to eliminate the "Brokerage" line (which would have permitted correct calculation of Reifler's entitlement), and substituted a new category called "Agency Trading." "Agency

Trading" apparently includes "Trading Profit," since that category disappeared.

36.   Thus Reifler entirely obscured the touchstone for computing his compensation. No longer could a director or shareholder or a Compensation Committee examine Pali's financial statements in the form concocted by Reifler and Wasitowski in order to determine whether Reifler overstated his compensation. They barred the door to any oversight at all by Directors, Compensation Committee members and shareholders.

37.   Reifler and Wasitowski well knew that the calculation of Reifler's compensation was contrary to the express provisions of his Employment Agreement. They confirmed that knowledge when Reifler insisted upon and received an extension, for an additional three years, of his Employment Agreement. The document memorializing that extension, entitled Amendment No. 1 to Employment Agreement, was executed by Reifler in March, 2006. It extends the term of the Employment Agreement, and expressly excludes any changes to the manner of calculation of Reifler's 3% compensation, as follows: "Except as herein amended, the Agreement shall remain in full force and effect, without amendment or modification."

**B.   REIFLER'S OTHER VIOLATIONS OF HIS EMPLOYMENT AGREEMENT**

38.   In addition to deliberately miscalculating his compensation under his Employment Agreement as set forth above, Reifler deliberately breached other material terms of his Employment Agreement, and deliberately concealed such breaches from the Board, its Compensation Committee and Pali's shareholders.   Among other things, contrary to the express terms of his Employment Agreement, Reifler:

(a)   failed to disclose the material facts to the Board of Directors with respect to
      Reifler's relationship or interest as to every contract or transaction between
      Reifler and Pali so as to permit the Board, in good faith, to authorize the contract
      or transaction by the affirmative vote of a majority of the disinterested directors;

(b)      failed to ensure that such contract or transaction was "entirely fair," to Pali, both economically and in the process by which it was approved;

(c)      did not devote 90% of his business time and services to the business and interest of Pali Capital, but rather spent more than 10% of his time pursuing his personal interests and investments;

(d)      did not "carry out and perform directions and policies of [Pali Holdings, Inc.'s] Board of Directors," but consistently ignored the Board on matters requiring their approval;

(e)      did not perform his duties as Chief Executive Officer and Chairman "with fidelity and to the best of his ability" and to "use his best efforts to promote the business of Pali Capital;"

(f)      engaged in conduct involving financial improprieties, theft, fraud, material violations of law relating to or affecting [Pali Holdings, Inc.] or its subsidiaries (including Pali Capital, Inc.) (including, without limitation, statues, orders, rules regulations or ordinances relating to or affect the registration, licensing and operations of [Pali Capital, Inc.]);" and

(g)      acted "as an officer, employee, partner, director, member, creditor, consultant, agent or advisor in a number of 'Competitive Enterprises.'"

**C.      SELF DEALING:  REIFLER CAUSED PALI TO PAY HIM MILLIONS OF DOLLARS OF ADDITIONAL COMPENSATION *UNRELATED* TO HIS EMPLOYMENT AGREEMENT WITHOUT THE KNOWLEDGE OR CONSENT OF THE BOARD OF DIRECTORS.**

39.    Reifler's pocketing of Pali's money was not limited to deliberate misinterpretation of the base on which his 3% compensation was computed. Rather, his penchant for ignoring fundamental rules of corporate governance and lining his own pockets was more pervasive than that. While the full extent of Reifler's avarice is not yet known, available records show that Reifler, aided and abetted by Wasitowski, awarded himself and took millions more, without full disclosure to and the knowledge or consent of the Board of Directors or its Compensation Committee.

40.    The fruits of Reifler's self-dealing include:

(a)     More than $1 million dollars in commissions earned in connection with Pali's hedge fund activities that Reifler secretly split with a managing director of Pali Capital Inc.;

(b)     $480,000 that Reifler awarded himself in "W-2 Salary;"

(c)     $582,642 that Reifler awarded himself as a result of what he describes as "Pali Futures;"

(d)     $254,664 that Reifler awarded himself as a result of what he describes as "Salesman's Commissions;"

(e)     $49,169 that Reifler awarded himself representing compensation of persons serving his personal needs;

(f)     $856,000 that Reifler awarded himself by causing Pali to pay that sum to Sky Blue Farms, an entity he owns;

(g)     $623,670 that Reifler awarded himself for incentive compensation;

(h)     $596,407 that Reifler awarded himself and Sky Blue Farm for "Loan Guarantee Fees;"

(i)     $50,000 that Reifler awarded himself in 2003 for consulting services to a company that he owns;

(j)     $126,340 that Reifler awarded himself in 2004 for consulting services to a company that he owns;

(k)     $163,669 that Reifler awarded himself in 2006 for consulting services to a company that he owns;

(l)     $257,648 that Reifler caused Pali to pay in commissions to Reifler Capital Advisors, Inc., a company he owns;

(m)     $148,210 that Reifler caused Pali to pay him in connection with a factoring agreement entered into on September 30, 2006 relating to Pali's Equity Derivatives Operations; and,

(n)     Compensation in a material amount in the form of warrants earned by Pali relating to investment banking deals with Burnham Hill Partners that Reifler caused Pali to transfer to himself.

41.   None of the compensation described in the preceding paragraph was ever authorized by Pali's Board of Directors or its Compensation Committee, nor was it ever determined or considered whether such compensation was "entirely fair" to Pali, as is required

by basic tenets of corporate law.

42.    Pali believes that further examination of its books and records will reveal additional material instances of self dealing involving significant additional compensation taken by Reifler. Given the material omissions from the Reifler Compensation Report, it is a reasonable inference that the Report is further materially misleading, incomplete and incorrect, and likely conceals still more improprieties by Reifler and Wasitowski.   Because the Independent Directors were denied access to books and records, it was not possible, prior to the discovery of Reifler's forgery and his forced resignation, to allege the exact amount of payments improperly taken by Reifler.  Pali's investigation and analysis of this issue continue.

**D.    REIFLER'S ILLEGAL ENTRENCHMENT EFFORTS BREACHED HIS FIDUCIARY DUTIES AND COST PALI MORE THAN $12 MILLION.**

43.    On July 28, 2008, the Majority Shareholders demanded that Reifler, as CEO, call a special shareholders' meeting for the purpose of voting on the removal of Pali's existing Board and the election of new directors. The requirement that the Chief Executive Officer call such a meeting when demanded by a majority of the shareholders is expressly provided for in the Pali bylaws and by the New York Business Corporation Law, Section 602(c).

44.    The primary purpose of a bylaw provision requiring corporate management to call a special shareholder meeting is "to give the stockholders the right to take certain action when they are dissatisfied with the current management or when the current management will not honor their wishes."[5]   As a result, the law is clear that actions taken by directors of a corporation primarily to entrench themselves in power violate the fiduciary duties of care and

---

[5]      *See Richman v. DeVal Aerodynamics, Inc.,* 183 A.2d 569, 570 (Del. Ch. 1962).

loyalty owed by directors to the corporation's shareholders.[6]

45.   Rather than call such a meeting, comply with the law, and permit the normal rules of proxy contests to play out  -- and thereby let shareholder democracy prevail -- Reifler concocted a series of schemes designed to entrench himself and his controlled "Reifler Directors" in power.  These schemes included (i) an attempt to improperly *dilute* the votes of the Majority Shareholders, (ii) an attempt to *disenfranchise*  the votes of the Majority Shareholders, and (iii) when other gambits failed, an attempt to *defraud* the Majority Shareholders by *forging* a proxy.  In the end, all of his tricks and ploys failed -- but not before he had caused Pali to spend and misuse more than $12 million dollars of Pali's money.

### (i)   Reifler's Attempt to *Dilute* the Majority

46.   Less than a week after the Majority Shareholders demanded a shareholders' meeting to remove Reifler, Reifler caused Pali to launch an effort to dilute the Majority Shareholders to minority status by attempting to give a friendly creditor -- Grupo Mundial --the right to vote 13% of Pali's outstanding shares even though the creditor had no right to participate in shareholder votes for three years under the terms of its finance arrangement.  If this gambit had been successful, it would have diluted the Majority Shareholders' 54% holding to 41% and would have illegally perpetuated Reifler in power.  That entrenchment effort, known as the "Mundial Dilution" is described below.

47.   Just before midnight on August 4, 2008, Reifler called an emergency meeting of Pali's Board. The meeting was to take place on August 7, 2008.  The agenda for the emergency Board meeting indicated that management was proposing to enter into a $25 million

---

[6]     *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 625 (S.D.N.Y. 1989); *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 663 (Del. Ch. 1988).

transaction with Grupo Mundial.  No detail or materials describing that transaction was provided to the Board in conjunction with the midnight notice to Board members.

48.    On August 7, 2008, three hours before the emergency Board meeting, Reifler instructed his Executive Vice President to send an e-mail with attachments describing the Mundial transaction to the two Pali board members who planned to attend the meeting by telephone. The e-mail instructed the directors, who were about to be asked by Reifler to vote to approve a $25 million transaction, that "[i]t is not necessary to have reviewed this material in advance."  The remaining directors were only given material relating to the transaction upon arrival at the meeting, not before. This last-second submission effectively guaranteed that the directors would be uninformed when they voted on the transaction, both as to economic terms of the loan and whether it was entirely fair to Pali and in the Company's best interests.  Worse, it concealed the extraordinary dilution described below.

49.    As proposed in those materials, the transaction involved a $25 million dollar convertible loan from Grupo Mundial with a provision -- first disclosed at the meeting -- that Grupo Mundial would be entitled to cast votes representing 324,675 shares of Pali common stock -- 13% of outstanding shares -- *even though Grupo Mundial was not a shareholder and, by the terms of the loan agreement, could not become a shareholder for three years.* Conferring such a voting right on Grupo Mundial would have constituted a dilution of the existing majority shareholders to minority status.

50.    Although the Pali Board had considered a possible loan from Grupo Mundial in the past, it had never proposed to award Grupo Mundial the extraordinary, unusual, and dilutive, immediate voting right as described above. Indeed, that was an entirely new,